IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA MARIE SILVA REPKA, | ) | CASE NO.  3:19-cv-00807 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tina Marie Silva Repka ("Plaintiff" or "Repka") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 22.

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to sufficiently explain how he considered Repka's obesity in combination with her other impairments at all steps in the sequential evaluation.  As a result, the undersigned cannot conduct a meaningful review of the Commissioner's decision and is unable to conclude that the Commissioner's decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## I.  Procedural History

On December 5, 2015, Repka protectively filed[1] an application for disability insurance benefits ("DIB").  Tr. 15, 85, 98, 192-198.  Repka alleged a disability onset date of November 22, 2013.  Tr. 15, 85, 97, 192.  She alleged disability due to problems with her ankle, knees, muscle spasms, and depression.[2]  Tr. 85, 98, 105, 117, 127.

After initial denial by the state agency (Tr. 117-125) and denial upon reconsideration (Tr. 127-133), Repka requested a hearing (Tr. 134-150).  A hearing was held before an ALJ on December 20, 2017.  Tr. 34-84.  On June 11, 2018, the ALJ issued an unfavorable decision (Tr. 12-29), finding that Repka had not been under a disability within the meaning of the Social Security Act, from November 22, 2013, through March 31, 2018, the date last insured (Tr. 15, 25).  Repka requested review of the ALJ's decision by the Appeals Council.  Tr. 189-191.  On February 11, 2019, the Appeals Council denied Repka's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

Repka was born in 1965.  Tr.  47.  As of the date of the hearing, Repka was married and living with her husband.  Tr. 47.  Her husband was working.  Tr. 47.  Repka completed one year of college.  Tr. 48.  Repka was last employed in 2013 for six months as a forklift operator.  Tr. 48-49.  She stopped working in 2013 after being injured at work.  Tr. 48.  Repka's other past

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/8/2020).

[2] Since Repka's appeal pertains only to her physical impairments, the Court's opinion is not focused on Repka's alleged mental health related impairments.

work included work as a machine operator, manufacturing envelopes; a different forklift operator position that included shipping and receiving; temporary agency work; and seasonal work packing hams.  Tr. 49-53.

**B.  Medical evidence**

**1.  Treatment history**

<u>*Right Knee*</u>

On May 12, 2012, Repka was seen in the hospital after being seen in the urgent care the previous day with complaints of knee pain and swelling.  Tr. 500.  The urgent care had advised her to call her doctor on Monday to follow up but Repka was concerned about the swelling in her knee.  Tr. 500.  Repka denied the inability to ambulate or bear weight but reported that she had pain with walking and her condition worsened with range of motion.  Tr. 500.  She relayed that her condition was relieved with elevation.  Tr. 500.  On examination of Repka's right knee, Repka exhibited limited range of motion; there was swelling anteriorly; and tenderness to palpation of the anterior knee with effusion.  Tr. 500-501.  The emergency room medical providers suspected a medial meniscus injury.  Tr. 501.  A knee mobilizer and pain medication were ordered and Repka was instructed to follow up with orthopedics; use the knee immobilizer when out of bed; and use ice and elevation.  Tr. 501-503.  A May 21, 2012, form bearing the name of Dr. Dennis Assenmacher, M.D., indicated that a right knee arthroscopy was planned. Tr. 498.

On November 5, 2013, Repka had x-rays taken of her right knee and she saw Dr. Assenmacher for follow up regarding her right knee.  Tr. 325-326, 329-330.  Dr. Assenmacher noted that Repka was status post right knee scope that was performed in 2012 by Dr. Levine.  Tr. 325.  Dr. Assenmacher indicated that Repka's right-knee x-rays showed mild degenerative

changes with spurring of the patella.  Tr. 325.  Repka relayed that she had been wearing a knee brace and reported that she had to get up and down in a forklift during the day.  Tr. 325.  She reported intermittent swelling and increased pain as the day progressed.  Tr. 325.  Repka's knee had been popping.  Tr. 325.  Twisting increased her pain and she was careful about how she walked.  Tr. 325.  Repka was taking Percocet for pain control.  Tr. 325.  On examination, Dr. Assenmacher observed mild effusion of the right knee; there was full extension and full flexion with guarding with full flexion; there was moderate guarding with McMurray's test[3] with tenderness of medial joint line; and there was good stability.  Tr. 325.  Dr. Assenmacher's impression was torn medial meniscus with chondromalacia of medial femoral condyle right knee.  Tr. 325.  Dr. Assenmacher advised that Repka should have arthroscopic surgery of the right knee and provided Repka with a prescription for Percocet while awaiting surgery.  Tr. 325. On November 25, 2013, Repka had arthroscopy of her right knee with chondroplasty of the patella, trochlea, medial femoral condyle right knee.  Tr. 466, 473-474.

During a December 6, 2013, post-surgical follow up visit with Chad Niemann, a physician assistant in Dr. Assenmacher's office, Repka had no complaints except for some residual post-operative pain and she indicated she was interested in transitioning to a weaker narcotic than Percocet.  Tr. 323.  Repka was provided with a return to work slip for January 6 and a prescription for Norco.  Tr. 323.  Repka was also provided with information regarding knee injections should she need them in the future.  Tr. 323.

On June 24, 2014, Repka was admitted to the hospital for knee pain, knee effusion, and rule out septic joint.  Tr. 466-471.  Repka had been having increasing pain and swelling in her knee.  Tr. 467.  It was noted that Repka had two prior aspirations that did not produce any joint

---

[3] "McMurray's test is used to determine the presence of a meniscal tear within the knee." *See* https://www.physio-pedia.com/McMurrays_Test (last visited 6/8/2020).

fluid.  Tr. 468.  Dr. Assenmacher as well as Dr. Charles S. Sheldon, D.O., saw Repka during her admission.  Tr. 467-468.  On examination, Dr. Sheldon observed that Repka's knee was somewhat swollen; there was a suggestion of effusion; her range of motion appeared relatively preserved; there was no significant crepitation; there was minimal dependent edema; pulses were intact; and there were no gross motor or sensory deficits.  Tr. 467.  On examination by Dr. Assenmacher, he observed moderate effusion of the right knee with full extension, flexion to 115 degrees; good stability; and mild tenderness.  Tr. 468.  Dr. Assenmacher indicated that Repka might be okay for physical therapy – weightbearing as tolerated and she might benefit from anti-inflammatory medication.  Tr. 468.  Dr. Assenmacher did not recommend aspiration because it did not appear that Repka had an infection in her knee.  Tr. 468.  Repka was cleared for discharge and advised to follow up in one week.  Tr. 467-468.

On August 20, 2014, Repka saw Mr. Niemann for follow up regarding her November 2013 right-knee scope.  Tr. 320-322.  Repka relayed that she had been doing well until a few weeks earlier when she started experiencing increased pain and swelling.  Tr. 320.  Mr. Niemann noted that x-rays showed significant arthritis, primarily in the patellofemoral joint.  Tr. 320. Repka was interested in conservative options.  Tr. 320.  On examination, Mr. Niemann observed trace to + 1 effusion; Repka's knee flexion arc was 0 degrees to 120 degrees; and there was tenderness with manipulation.  Tr. 320.  Mr. Niemann aspirated Repka's right knee and provided her with a prescription for Norco.  Tr. 320.

On June 14, 2017, Repka saw nurse practitioner Cheryl L. Jeffers regarding her back pain, knee pain, and ankle pain.  Tr. 552-562.  Repka described her right knee pain as aching, with a severity level rating of 4/10, moderate.  Tr. 558.  Repka was able to bear weight, had no muscle weakness, numbness or tingling.  Tr. 558.  Repka's symptoms were aggravated by

movement and weight bearing activity.  Tr. 588.  She had tried icing her knee and NSAIDs, with those treatments providing some relief.  Tr. 558.  On examination of the right knee, Repka exhibited decreased range of motion, swelling, effusion, and tenderness.  Tr. 561.  Ms. Jeffers gave Repka depomedrol for her knee and shoulder pain and indicated Repka would need to return to orthopedics for an evaluation of the accumulation of fluid in her knee, noting Repka had it drained in the past.  Tr. 562.

### *Left ankle*

In November 2013, an MRI of Repka's left ankle was ordered as a result of a contusion and laceration that occurred on August 6, 2013.  Tr. 477-478.  The MRI showed no acute fracture; mild edema within Kager's fat-pad and the Achilles' paratenon; no Achilles tendinopathy or Achilles tendon tear; and a longitudinal split tear of the peroneus brevis with peroneal tendinosis and mild tenosynovitis.  Tr. 478.  On January 27, 2014, Repka underwent surgery on her left ankle performed by Dr. Thomas Padanilam, M.D.  Tr. 343.  She had a left peroneus brevis repair using a free tendon graft and tenodesis of the peroneus longus to brevis tendon.  Tr. 343.

On March 10, 2014, Repka saw Dr. Padanilam for a post-surgical follow up.  Tr. 340. Repka had been in a short-leg cast.  Tr. 340.  She was doing well with it, noting she had a couple falls but did not hit her foot or ankle or put any weight on it.  Tr. 340.  Dr. Padanilam felt that Repka was doing well post-surgery.  Tr. 340.  Repka was moved into a boot and was informed that she could start weightbearing when in the boot.  Tr. 340.  Dr. Padanilam recommended physical therapy; advised Repka to return for re-evaluation in four weeks; and provided Repka with some Percocet for pain control.  Tr. 340.

Repka saw Dr. Padanilam for follow up on April 7, 2014.  Tr. 339.  Repka relayed that she had been full weightbearing in her boot. Tr. 339.  She had some swelling and moderate pain. Tr. 339.  On examination, Dr. Padanilam observed moderate swelling in the left foot and lateral ankle; tenderness over the peroneal tendon area; and 4/5 strength of the peroneals.  Tr. 339.  Dr. Padanilam started Repka on Mobic.  Tr. 339.  Repka's Percocet was refilled but the goal was to start to work Repka off Percocet.  Tr. 339.  Dr. Padanilam recommended that Repka progress out of the boot and move into an ASO brace for support.  Tr. 339.  Dr. Padanilam indicated that Repka would continue to elevate and use ice.  Tr. 339.

Repka continued to see Dr. Padanilam for follow up regarding her ankle surgery.  *See e.g.*, Tr. 338 (5/19/2014); Tr. 337 (6/16/2014); Tr. 336 (7/28/2014); Tr. 335 (9/15/2014); Tr. 334 (11/19/2014).  As of at least July 28, 2014, Repka was using a regular shoe.  Tr. 336.  At the July 28, 2014, visit, Dr. Padanilam recommended a functional capacity evaluation.  Tr. 336.

During her September 15, 2014, visit, Repka explained that she was not working at that time but was looking for a job. Tr. 335.  Repka reported pain and swelling that she felt was related to the weather. Tr. 335.  Repka had attended a functional capacity evaluation. Tr. 335.  Dr. Padanilam reviewed those results and indicated that Repka "should start four weeks of work hardening and then . . . have her return to work[.]" Tr. 335.  Dr. Padanilam noted that her only restrictions would be no heights and no use of ladders. Tr. 335.  Dr. Padanilam indicated that the request would be submitted through Worker's Compensation and he would see Repka on an as needed basis. Tr. 335.

At her November 19, 2014, visit with Dr. Padanilam, Repka relayed that she had not been contacted regarding the work hardening program. Tr. 334.  Repka had been taking Mobic but she did not notice any improvement and her ankle was continuing to swell. Tr. 334.  Repka was

working on her home exercise program and denied any numbness or tingling.  Tr. 334.  On examination of the left foot and ankle, Dr. Padanilam noted that Repka had some tenderness to palpation along her incision; decent active range of motion and decent strength with the exception of some slight weakness of 4/5 with resisted eversion; sensation was grossly intact to light touch; and good palpable pulses distally.  Tr. 334.  Dr. Padanilam discussed the possibility of an AFO brace to provide Repka with more support and stability.  Tr. 334.  Dr. Padanilam mentioned the possibility of permanent restrictions down the line as needed.  Tr. 334.  He felt at that time Repka had reached maximum medical improvement.  Tr. 334.

During an internal medicine appointment with nurse practitioner Kelly Finney on November 19, 2015, regarding her knee pain and ankle pain, Repka relayed that her ankle and knee pain were severe and she was unable to be on her feet for more than a few hours at a time.  Tr. 398.  Repka rated her pain as a 7/10 and described it as sharp and stabbing and also dull and aching at times.  Tr. 398.  On examination, Nurse Finney noted that Repka's ankles were swollen 1+ bilaterally; her knees were painful with rotation; and there was pain in Repka's lumbar spine.  Tr. 400.  Nurse Finney prescribed Percocet to be taken as needed and advised Repka to follow up in about three months.  Tr. 401.

After not seeing Dr. Padanilam for about a year and a half, Repka saw him on April 15, 2016.  Tr. 445.  Repka relayed that she was never able to get back to work.  Tr. 445.  She reported she had never received the AFO brace that Dr. Padanilam had given her an order for and that was approved by Worker's Compensation.  Tr. 445.  She explained she was using a lace-up ankle brace.  Tr. 445.  Repka's ankle was still swelling and she was having pain and balance issues.  Tr. 445.  X-rays of the ankle were taken in the office that day and they showed a large plantar heel spur, otherwise the joint spaces were well maintained and there were no fractures or

other abnormalities.  Tr. 445.  Dr. Padanilam recommended another prescription for an AFO brace which he would try to get approved through Worker's Compensation and see Repka back for follow up.  Tr. 445.

During an October 12, 2016, office visit with Nurse Jeffers, Repka complained of left foot pain.  Tr. 514.  On examination of the left foot, Nurse Jeffers observed decreased range of motion and tenderness.  Tr. 517.  There was no swelling, normal capillary refill, and no deformity.  Tr. 517.  Nurse Jeffers noted that Repka may need to call Dr. Padanilam regarding the foot pain.  Tr. 518.

During her June 14, 2017, visit with Nurse Jeffers regarding Repka's back, knee, and ankle pain, on physical examination, Nurse Jeffers observed swelling and tenderness in the left ankle but normal range of motion.  Tr. 561.  During a July 18, 2017, internal medicine office visit, Repka continued to complain of left ankle pain, reporting a pain severity level of 9/10.  Tr. 571.  She indicated that Percocet provided moderate relief for her symptoms.  Tr. 571.

During an office visit with nurse practitioner Diane J. Kielmeyer on July 18, 2017, Repka complained of left ankle pain.  Tr. 571.  Repka relayed that she had several surgeries with little improvement.  Tr. 571.  She took Percocet for pain relief.  Tr. 571.  On physical examination, Repka exhibited normal range of motion.  Tr. 574.  Repka declined physical therapy or pain management because she felt it had not helped in the past.  Tr. 574-575.

*Right shoulder*

On June 12, 2015, Repka saw internal medicine nurse practitioner Ginger Bullimore regarding shoulder pain.  Tr. 359, 363.  Repka also reported elbow pain that was getting worse.  Tr. 359, 363.  Repka explained that she had fallen on her right shoulder about six months earlier.  Tr. 364.  After that fall, Repka's right shoulder pain that had resolved returned again and was

9

getting progressively worse.  Tr. 364.  On examination of the right shoulder, Repka had a decreased range of motion and pain.  Tr. 366.  Repka took Motrin for pain but with minimal relief.  Tr. 364.  Repka received an injection in her shoulder and received prescriptions for a Medrol Dosepack and Percocet.  Tr. 367.  Nurse Bullimore ordered an x-ray of the right shoulder.  Tr. 362, 367.  Right shoulder x-rays taken on June 16, 2015, showed mild degenerative changes without acute ossific abnormality appreciated.  Tr. 464.

During an October 12, 2016, internal medicine visit with Nurse Jeffers regarding left foot pain, Repka noted that she had also noticed some right shoulder pain while sleeping.  Tr. 514.  On examination of the right shoulder, Repka exhibited decreased range of motion and tenderness but no swelling, effusion, or crepitus.  Tr. 517.  Nurse Jeffers prescribed Prednisone for tendonitis and provided Repka with shoulder stretches.  Tr. 518-519.

During her office visit with Nurse Kielmeyer on July 18, 2017, Repka complained of right shoulder pain that was better with Celebrex.  Tr. 564, 570.

*Back pain*

During Repka's October 12, 2016, office visit with Nurse Jeffers, back pain was noted to be a chronic condition since July 1, 2014.  Tr. 507.

On February 13, 2017, Repka saw Nurse Jeffers for a four-month check up regarding her back pain.  Tr. 525.  A musculoskeletal examination showed normal range of motion and no edema.  Tr. 529.

Repka saw Nurse Jeffers on March 15, 2017, with complaints of back pain across her lower back that she had been having for three weeks.  Tr. 532.  Repka indicated that the problem occurred intermittently.  Tr. 539.  Repka complained that it hurt when she sat or leaned forward.  Tr. 532.  Repka's symptoms were also aggravated by bending and standing.  Tr. 539.  Repka did

not have pain radiating down her legs.  Tr. 539.  She described the pain as moderate.  Tr. 539.

On examination of the lumbar back, Repka exhibited decreased range of motion, tenderness,

swelling, pain and spasm.  Tr. 542.  Nurse Jeffers prescribed medication and provided Repka

with back stretches.  Tr. 543.

During her office visit with Nurse Kielmeyer on July 18, 2017, Repka complained of

chronic lower back pain.  Tr. 564, 570.  The musculoskeletal examination showed a normal

range of motion.  Tr. 574.  Repka relayed that pain medication did provide her with relief.  Tr.

574.  Repka declined physical therapy and pain management because she had tried in the past

and did not find it helpful.  Tr. 574-575.

### Obesity

Repka's medical records reflect a diagnosis of obesity. *See e.g.*, Tr. 420, 423 (1/26/2016,

office visit (weight 183 lbs, 6.4 oz)); Tr. 508 (1/12/2016, office visit (weight 189 lbs, 9.6 oz;

height 5'3.5")); Tr. 521 (2/13/2017, office visit (weight 194 lbs, 4.8 oz; height 5'4")).   During

an internal medicine visit with Nurse Finney on January 25, 2016, for follow up regarding

chronic pain, Nurse Finney notes indicate "morbid obesity – discussed exercises that are doable

with ankle/leg restrictions."  Tr. 408.

### 2.  Opinion evidence

### Functional capacity evaluation

On Dr. Padanilam's referral, on August 19, 2014, Jeffrey D. Swartz completed a

functional capacity evaluation relating to Repka's left peroneal tendon repair.  Tr. 345-355.  Mr.

Swartz observed that, during material handling activities, Repka's right knee and shoulder

frequently were the reasons for termination of testing, not her left ankle.  Tr. 346.  She was

unable to perform a squat to the floor secondary to right knee pain.  Tr. 346.  Repka could lift 50

pounds from high level to the floor level.  Tr. 345.  She could lift 30 pounds on an occasional

basis from waist to shoulder and 20 pounds on an occasional basis from shoulder to overhead,

both limited by right shoulder.  Tr. 346.  Repka could carry 40 pounds occasionally limited by

right shoulder and right knee.  Tr. 346.  She could push 38 pounds of force and pull 35 pounds of

force occasionally with pushing being easier than pulling but both being limited by the right

knee.  Tr. 346.  Repka "demonstrated occasional walking with a maximum sustained duration of

8 minutes 10 seconds (0.24 miles) . . .  [using] bilateral hand rails to minimize stress to the right

knee, which was the reason for termination of testing."  Tr. 346.  Repka could perform dynamic

standing for 63 minutes with no issues.  Tr. 354.  Repka could climb 15 consecutive steps limited

by the right knee.  Tr. 346.

> Mr. Swartz summarized the functional capacity evaluation findings, stating:
>
> In terms of the left lower extremity, client demonstrated within normal limits of range of motion at the left hip, knee and ankle.  Strength was noted to be 5/5 throughout the entire left leg with the exception of eversion, which was 4/5.  Client did have a slight decrease in strength with eversion at the conclusion of today's test, but no appreciable change in girth was noted.  Client's right knee range of motion was limited both at the beginning and conclusion of today's test with a slight increase in swelling at the conclusion of the test.  Her right shoulder range of motion was within normal limits in all directions and was equal to left-sided measures. Client did have a slight decrease in the right shoulder flexion with abduction strength.

Tr. 346.

Mr. Swartz had no further recommendations for continued physical therapy or work

conditioning secondary to secondary medical issues of the right knee and shoulder.  Tr. 347.  Mr.

Swartz indicated that Repka did not demonstrate any limitations with the testing due to the left

ankle.  Tr. 347.

*Consultative examiner*

On March 11, 2016, Repka saw Sushil M. Sethi, M.D., M.P.H., F.A.C.S., for a consultative evaluation.  Tr. 438-444.  On examination, Dr. Sethi observed some range of motion limitations in the left ankle, right shoulder, and lumbar spine.  Tr. 439, 440.  Repka was not using an ambulatory aid; she was able to get on and off the examination table without difficulty; her gait on level surface was normal without limping; and her motor strength was 5/5.  Tr. 439. Following Dr. Sethi's evaluation, Dr. Sethi's impression was history of facet arthritis at L4-5; non-specific right shoulder pain; remote history of right knee repair for arthroscopy and chondromalacia; left ankle surgery in the past; and gastric reflux.  Tr. 440.  Dr. Sethi provided the following medical source statement:

> Based on my objective findings, the claimant's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, and handling objects may be slightly affected.  She can sit 8 hours, walk 6 hours, and stand 6 hours.  She can carry 10-30 pounds frequently and 40-60 pounds occasionally.  Her hearing, speaking, and traveling are normal.

Tr. 440.

*State agency reviewers*

On March 19, 2016, state agency reviewing physician Anne Prosperi, D.O., completed a physical RFC assessment.  Tr. 91-93.  Dr. Prosperi opined that Repka had the RFC to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday. Tr. 91-92. Dr. Prosperi opined that Repka's ability to push/pull with her left lower extremity was limited to frequently using foot controls on the left.  Tr. 92.  Dr. Prosperi explained that the lower extremity limitation was because Repka was status post left peroneal longus and brevis tenodesis with

peroneal brevis repair with some continued pain and mild limitation of motion.  Tr. 92.  Dr. Prosperi also noted that Repka has pain in her back, right shoulder, knees, and left ankle.  Tr. 92.

With respect to postural limitations, Dr. Prosperi opined that Repka could never climb ladders/ropes/scaffolds; she could occasionally kneel and crawl; and she could frequently climb ramps/stairs, stoop, and crouch.  Tr. 92.  Dr. Prosperi explained that Repka had to avoid climbing ladders/ropes/scaffolds due to limited musculoskeletal range of motion and obesity.  Tr. 92.

With respect to manipulative limitations, Dr. Prosperi opined that Repka was limited to frequent overhead reaching with the right arm due to slightly decreased range of motion in the shoulder.  Tr. 92-93.

Upon reconsideration, on July 12, 2016, state agency reviewing physician William Bolz, M.D., completed a physical RFC assessment, wherein he reached the same conclusions as Dr. Prosperi.  Tr. 107-109.

## C.    Testimonial evidence

### 1.      Plaintiff's testimony

Repka was represented and testified at the hearing.  Tr.  36, 46-71.   Repka was using a walker at the hearing.  Tr. 56.  Repka had been using the walker for about three months.  Tr. 56.  Repka indicated that her doctor had not prescribed the walker but advised her to get one if she needed to prevent falls.  Tr. 56.

When Repka was last employed as a forklift operator, she was injured in an accident at work.  Tr. 53.  The accident occurred in August 2013.  Tr. 54.  Repka's left leg – between her ankle and knee – was sliced open by another forklift.  Tr. 53-54.  In January 2014, Repka had her leg repaired but the procedure was not entirely successful.  Tr. 54-55.  Her ankle still gives out and swells up which causes Repka to lose her balance.  Tr. 55.  Her physician, Dr. Padanilam has

indicated that her ankle will only get worse, not better.  Tr. 55.  At some point following her surgery, Repka started to use a brace on her ankle.  Tr. 55, 61.

Repka's ankle has changed in color – it is now dark.  Tr. 61.  Repka's ankle swells after she has been sitting down for two or three hours.  Tr. 61-62.  She has swelling in her ankle every day and there are certain days – over a period of three or four days – when her ankle swells up like a big balloon.  Tr. 62.  The swelling will subside for about a month and then the swelling starts back up again.  Tr. 62.  Repka does not have full mobility in her ankle.  Tr. 62.  She cannot flex it completely up and down.  Tr. 62.  Without her brace, Repka is able to hold her foot up. Tr. 62.

In addition to her left ankle problems, Repka has problems with her right knee.  Tr. 56. Repka's knee problems are not the result of the 2013 workplace injury.  Tr. 56-57.  She had arthroscopic surgery performed in November 2013.  Tr. 57.  Repka indicated that the surgery went okay.  Tr. 57.  She had a little relief because the water was drained out of knee.  Tr. 57-58. After her surgery, she was able to walk a little better on it.  Tr. 58.  However, the surgery did not resolve all her problems.  Tr. 57.  She explained that she was supposed to return every six months for an injection in her knee because it still swelled up but she has been unable to afford the costs associated with the injections.  Tr. 57, 61.  Repka is supposed to have a brace on her knee but she does not use it.  Tr. 61.  Repka indicated that her knee pain was worse when it rained and through the winter.  Tr. 66-67.

Repka indicated that she has swelling in her right knee almost every day.  Tr. 59.  Her knee does not swell up a whole lot at once.  Tr. 59.  Over the course of a couple of days, the swelling starts to get really bad and she has to elevate her knee in order to reduce the swelling. Tr. 59.  Her doctors have advised her to elevate her knee when she gets swelling and to keep it

elevated until the swelling subsides.  Tr. 59-60.  At times, it can take a couple of days for the swelling to go down.  Tr. 60.  She elevates her knee above her heart level.  Tr. 60.  Her doctor has not recommended further surgery on her knee but has recommended that she get a shot every six months and to return to have her knee drained if it fills back up with water.  Tr. 61.  Dr. Assenmacher is the physician that Repka sees for her knee.  Tr. 63.

Repka has arthritis in her right shoulder that started about two years earlier.  Tr. 58. Repka takes Celebrex for her shoulder and it helps a little bit.  Tr. 58-59.  She has had cortisone shots in her right shoulder but has not had physical therapy for her shoulder.  Tr. 65-66.  As of the date of the hearing, the last shot Repka had in her shoulder was in June 2015.  Tr. 66.

Repka had not seen Dr. Assenmacher since 2014 because she could not afford to go back to him.  Tr. 63.  Repka last saw Dr. Padanilam for her ankle in 2015.  Tr. 63.  Repka saw her family doctor, Dr. Jeffers, about three months prior to the hearing.  Tr. 63-64.

Repka is 5'3" and weighed 198 pounds at the time of the hearing.  Tr. 68-69.  She had gained weight since she started having problems with her knee and ankle.  Tr. 69.  Prior to those problems, she estimated weighing around 160 or 165 pounds.  Tr. 69.

Repka has a driver's license but she does not drive that often because, if she drives too long/sits too long, her ankle or her leg starts to swell up.  Tr. 47-48.  She estimated driving about three times a week for an average distance of 20 miles.  Tr. 69.  Repka estimated being able to stand for about two hours.  Tr. 64.  After sitting for about two or three hours, Repka's legs start to swell up.  Tr. 64.  Repka did not think she would be able to make it through an 8-hour day by alternating between sitting for an hour or so and standing for a few minutes because her "legs would start hurting . . . from up and down, and they'd still end up swelling."  Tr. 64.  Repka estimated being able to walk about two blocks with her walker and about one block without her

16

walker.  Tr. 64.  After walking about a block, her knee and ankle would start to hurt and she would lose her balance.  Tr. 64-65.  Repka has fallen in the past.  Tr. 64-65.  Repka has problems bending over to pick something up off the floor.  Tr. 65.  Repka has problems with stairs.  Tr. 69.  She has problems reaching up into a cupboard because of her shoulder.  Tr. 69.  Bending over at the waist is difficult because it hurts her back.  Tr. 69.  Repka was not certain what was causing her back problems.  Tr. 70.  She indicated that Dr. Jeffers was supposed to order an x-ray for her back.  Tr. 70.

Repka can make her own bed.  Tr. 67.  She can dress herself but has to sit down on the bed to do so.  Tr. 67-68.  Repka's husband installed a grab bar in the shower so Repka is able to take a shower without falling.  Tr. 67.  When Repka does dishes she has to take breaks because, if she stands too long, her legs start to hurt.  Tr. 67.  Repka's husband carries the laundry for her and she takes breaks doing the laundry.  Tr. 67.  Repka's husband does the grocery shopping because Repka cannot do it with her leg.  Tr. 67.  Repka does not belong to any clubs.  Tr. 68.  She used to go fishing a lot but cannot go anymore.  Tr. 68.  She last fished about three years prior to the hearing.  Tr. 68.  Repka wakes up about every two hours in the evening because of pain in her leg and ankle.  Tr. 68.

### 2.    Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 71-83.  The VE described Repka's past work as follows: (1) forklift operator was an SVP 3 (semi-skilled),[4] medium position as described in the Dictionary of Occupational Titles ("DOT") and performed by Repka

---

[4] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

at medium; (2) material handler was an SVP 3, heavy position as described in the DOT but performed by Repka at medium; (3) envelope machine operator was an SVP 4, medium position as described in the DOT but performed by Repka at light; and (4) hand packer was an SVP 2, medium position as described in the DOT but performed by Repka at light.  Tr. 72-73.

The ALJ asked the VE to assume a hypothetical individual with the same age, education and work experience as Repka with the RFC to perform a full range of medium work, except she can frequently use left-foot controls; can frequently climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently stoop and crouch; can never kneel and crawl; can occasionally reach overhead with her right arm; and can never be exposed to unprotected heights.  Tr. 73.  The ALJ asked the VE whether the described individual could perform Repka's past relevant work, either as Repka actually performed it or as the jobs are generally performed in the national economy.  Tr. 73.  The VE indicated that the envelope machine operator, hand packer, and forklift operator positions would be available to the described individual both as described in the DOT and as performed by Repka and, the material handler position would be available to the individual but only as performed by Repka.  Tr. 73-74.  The VE indicated that there were also other jobs that the described individual could perform in the medium, unskilled category, including janitor, laundry worker, and assembler.[5]  Tr. 74-75.

The ALJ then asked the VE to consider a second hypothetical which the ALJ explained included the same limitations as in the first hypothetical but at the light exertional level.  Tr. 75. The VE indicated that the described individual would be able to perform Repka's past work of hand packer and envelope machine operator as performed by Repka but not as described in the DOT.  Tr. 75.  The VE indicated there would be other jobs available in the national economy in

---

[5] National job incidence data was provided for the identified jobs.  Tr. 74-75.

the light, unskilled category, including sorter, inspector packer, and general office helper.[6]  Tr. 75-76.

For the ALJ's third hypothetical, he asked the VE to assume the same limitations as in the prior hypothetical except at the sedentary exertional level.  Tr. 76.  The VE indicated that the described individual would be unable to perform any of Repka's past relevant work.  Tr. 76.  The VE indicated, however, that there would be jobs in the sedentary, unskilled category that the individual could perform, including inspector, assembler, and information clerk.[7]  Tr. 76.

With respect to allowances for ordinary breaks, the VE indicated that employers will generally provide two 15-minute breaks and a 30-minute break during an eight-hour period.  Tr. 76.  The VE indicated that the ordinary tolerance for absenteeism is one excused absence per month after the probationary period but, during the probationary period, many employers do not allow any absences.  Tr. 77.  As far as the ordinary tolerance for being off-task, the VE indicated that, if an individual is off-task 15% of time or more, it would be work preclusive.  Tr. 77.

Repka's counsel asked the VE whether adding to either the light or medium hypothetical a requirement that the individual should not be involved in anything involving uneven terrain would impact the availability of the identified jobs.  Tr. 77-78.  The VE explained that in either the medium category jobs identified, i.e., janitor, laundry worker, and assembler, or the light category jobs identified, i.e., sorter, inspector packer, and general office clerk, the individual would be working indoors and would not be on uneven terrain.  Tr. 78.

In response to further questioning from Repka's counsel, the VE indicated that, if the individual needed two to three additional 10-15 breaks in order to elevate her leg above waist

---

[6] National job incidence data was provided for the identified jobs.  Tr. 75-76.

[7] National job incidence data was provided for the identified jobs.  Tr. 74-75.

level, the light and medium jobs identified would be eliminated because additional breaks would not be allowed and the jobs would not allow for someone to elevate their legs at their workplace. Tr. 78.  The VE indicated that the need to take additional breaks and to elevate at waist level would also preclude sedentary work.  Tr. 78.  The VE stated that wearing a foot brace would not appear to impact the availability of the jobs identified.  Tr. 79.  If the described individual required the use of a walker, the VE indicated that the light and medium jobs would be eliminated.  Tr. 79.

Repka's counsel then asked the VE about a sit-stand option, asking the VE to consider an individual at the medium level who would not be outside her workspace but, who, after standing for a period of 20 minutes, would have to sit for a couple of minutes before standing again.  Tr. 79-80.  The VE explained that the medium level jobs would not allow for the sit-stand option but, with a significant reduction in the number of jobs, the light level jobs would be available. Tr. 80-81.  If the described individual was only able to walk for a maximum of eight minutes at a time, the VE indicated that the light and medium level jobs would be eliminated.  Tr. 81-82.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his June 11, 2018, decision the ALJ made the following findings:[10]

1.    Repka last met the insured status requirements of the Social Security Act
      on March 31, 2018.  Tr. 17.

2.    Repka did not engage in substantial gainful activity during the period from
      her alleged onset date of November 22, 2013, through her date last insured
      of March 31, 2018.  Tr. 17.

3.    Through the date last insured, Repka had the following severe
      impairments: tear of the left peroneus brevis with peroneal tendinosis and
      mild tenosynovitis status post surgical repair; chondromalacia of the
      patella and femoral condyle of the right knee status post arthroscopy; and
      degenerative changes of the right shoulder.  Tr. 17.  Gastrointestinal reflux
      disease, obesity, degenerative disc disease of the lumbar spine, and
      depressive disorder were non-severe impairments.  Tr. 18-19.

4.    Through the date last insured, Repka did not have an impairment or
      combination of impairments that met or medically equaled the severity of
      one of the listed impairments.  Tr. 19.

5.    Through the date last insured, Repka had the RFC to  perform light work
      as defined in 20 C.F.R. § 404.1567(b) except she could frequently use left
      foot controls; could frequently climb ramps and stairs; could never climb
      ladders, ropes, or scaffolds; could frequently stoop and crouch; could never
      kneel and crawl; could occasionally reach overhead with her right arm; and
      could never be exposed to unprotected heights.  Tr. 19-23.

6.    Through the date last insured, Repka was capable of performing past
      relevant work as an envelope machine operator and hand packer as actually
      performed.   Tr. 23-24.   In the alternative, considering Repka's age,
      education,[11] work experience, and RFC, there are jobs that exist in
      significant numbers in the national economy that Repka can perform,
      including sorter, inspector/packer, and general office helper.  Tr. 24-25.

---

[10] The ALJ's findings are summarized.

[11] Repka was born in 1965 and was 48 years old, which is defined as a younger individual age 18-49, on the date last
insured but subsequently changed age category to closely approaching advanced age.  Tr. 24.  Repka has at least a
high school education and is able to communicate in English.  Tr. 24.

Based on the foregoing, the ALJ determined Repka was not under a disability, as defined in the Social Security Act, from November 22, 2013, the alleged onset date, through March 31, 2018, the date last insured.  Tr. 25.

## V. Plaintiff's Arguments

Repka argues: (1) the ALJ did not properly analyze her obesity throughout the sequential evaluation; (2) the RFC is not supported by substantial evidence because it did not include a need to elevate legs above waist level to reduce swelling; and (3) the ALJ's reliance upon the VE testimony does not constitute substantial evidence because the VE hypothetical upon which the ALJ relied did not include a requirement that claimant would need to elevate her legs.  Doc. 17, pp. 13-25; Doc. 21.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.     Reversal and remand is warranted

Repka argues that reversal and/or remand is required because the ALJ did not properly consider and analyze her obesity throughout the entire sequential evaluation as required by SSR 02-1p and case law.  She contends that her obesity in combination with her other impairments increased the severity of her ankle and knee conditions.

"Social Security Ruling 02-01p [Evaluation of Obesity] does not mandate a particular mode of analysis." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. 2006); *see also Nejat*, 359 Fed. Appx. at 577 (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412). However, SSR 02-1p does provide that obesity will be considered by an ALJ in assessing a claimant's disability claim at the various steps in the sequential evaluation process.  2002 WL 34686281, at * 2-3 (Sept. 12, 2002); *Nejat v. Comm'r of Soc. Sec*., 359 Fed. Appx. 574, 577 (6th Cir. 2009) (SSR 02-1p "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.") (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412)); *see also Shilo v. Comm'r of Soc. Sec.*, 600 Fed. Appx. 956, 959 (6th Cir. 2015) (quoting *Nejat*, 359 Fed. Appx. at 577)).

As explained in SSR 02-1p, obesity "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems" 2002 WL 34686281, at * 3.  "[O]besity may increase the severity of coexisting or related impairments to

the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments."  2002 WL 34686281, at * 5.  And, "[a]n assessment should . . . . be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain a function over time."  2002 WL 34686281, at * 6.

At Step Two, the ALJ acknowledged that Repka's medical conditions included obesity and found that obesity was not a severe impairment.  Tr. 18.  The ALJ proceeded to state that he "considered the combined effect of all impairments on the claimant's ability to function without regard to whether any such impairment, if considered separately, would be of sufficient severity[.]"  Tr. 18.  However, the ALJ did not refer to SSR 02-1p or analyze Repka's obesity under the framework contained in SSR 02-1p.  Other than the mention of obesity at Step Two (Tr. 18) and one reference to Repka's height (5'3") and weight (198 pounds) (Tr. 20), the ALJ provided no analysis at Steps Three through Five as to how Repka's obesity was considered in combination with Repka's other impairments, including those affecting her left ankle and right knee.

Here the ALJ's analysis of Repka's obesity is so lacking in substance that the Court is unable to conduct a meaningful review to determine whether the Commissioner's decision is supported by substantial evidence.  For example, Repka's counsel raised the issue of obesity at the hearing and its potential impact on a determination under Listing 1.02.  *See* Tr. 39 ("I would take notice of the issue that there is obesity involved.  And in terms of the functional analysis of that, obviously the more you weigh and you're standing on your ankle, it brings into play 1.02.").  Yet, at Step Three, there is no analysis of how, if at all, the ALJ considered Repka's obesity

along with Repka's other impairments when finding that Repka's impairments did not meet or equal Listing 1.02, which addresses major dysfunction of a joint. Tr. 19. Additionally, assuming arguendo that Repka being able to walk a quarter mile in eight minutes (at a speed of 1.8 miles/hour) during her functional capacity evaluation test amounts to effective ambulation, as indicated by the ALJ (Tr. 19), during that functional capacity evaluation test, Repka had to hold on to bilateral handrails to minimize stress to her right knee (Tr. 353).

The Commissioner acknowledges that the ALJ did not discuss Repka's obesity extensively but argues that the Court should find that the ALJ properly evaluated Repka's obesity because the ALJ considered the opinions of the state agency reviewing physicians who considered evidence of Repka's obesity. Doc. 19, p. 14 (relying on *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. 2010); *Bledsoe*, 165 Fed. Appx. 408).

Although courts have upheld decisions where an ALJ does not specifically consider a claimant's obesity but where an ALJ considers opinions that considered obesity, here, the state agency reviewing physicians only noted obesity when explaining Repka's postural limitations, i.e., when explaining why Repka would have to avoid climbing ladders, ropes and scaffolds. There is no discussion of how or whether Repka's obesity in combination with her ankle and knee impairments affects her exertional limitations, e.g., her ability to walk, stand and sit.

In this case, without a more reasoned analysis by the ALJ regarding how he considered Repka's obesity when assessing her claim throughout all stages of the sequential evaluation, the Court is unable to affirm the Commissioner's decision.

## C.  Other issues raised on appeal

Repka also argues that the RFC is not supported by substantial evidence because it did not include a need to elevate legs above waist level to reduce swelling and the ALJ's reliance

upon the VE testimony does not constitute substantial evidence because the VE hypothetical upon which the ALJ relied did not include a requirement that the claimant would need to elevate her legs. The undersigned does not address these additional arguments because, on remand, the ALJ will reassess Repka's obesity in combination with her other impairments and that assessment may impact the ALJ's determination of those additional issues.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Memorandum Opinion and Order.

Dated: June 8, 2020

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge